Carrie J. Smith, individually and as executrix of the estate of Harry W. Smith, Jr., deceased, filed this action against Mutual Benefit Life Insurance Company, Equifax Services, Inc., and Lillian Puckett, an employee of Equifax. Her claims arose from an insurance transaction between Mr. Smith and Mutual Benefit. Equifax and Puckett filed a motion to dismiss, which the trial court considered as a motion for summary judgment and granted. The action is still pending against Mutual Benefit. The summary judgment was made final in accordance with Rule 54(b), A.R.Civ.P.
There were three claims against Equifax and Ms. Puckett: (1) negligence in the collection, assembly, transmission, or handling of medical records and other information concerning Mr. Smith; (2) intentional misconduct in the collection, assembly, transmission, or handling of medical records and other information concerning Mr. Smith; and (3) breach of a contract between Mutual Benefit and Equifax as to which Mr. Smith and/or Ms. Smith was a third-party beneficiary.
 Deceased Insured's Action for Negligence and Intentional Misconduct
This action was filed after Mr. Smith's death. A claim for negligence, for which no action has been filed, does not survive death in favor of the personal representative.Gillilan v. Federated Guaranty Life Insurance Co.,447 So.2d 668, 674 (Ala. 1985). A claim for intentional misconduct is ex delicto in nature; and, as such, it does not survive in favor of the personal representative of a deceased person under the provisions of Code 1975, § 6-5-462.Bates v. L N Employees Credit Union, 374 So.2d 323,324 (Ala. 1979); Sanford v. Western Life InsuranceCo., 368 So.2d 260, 263 (Ala. 1979).
 Beneficiary's Individual Action for Negligence
In the case of Royal Neighbors of America v.Fortenberry, 214 Ala. 387, 107 So. 846 (1926), the Court held:
 "[T]he right of action for failure to promptly issue, or negligence in the due issue of the policy or certificate, pursuant to the application, is . . . not in the beneficiary named in the application." 214 Ala. at 390, 107 So. at 849.
In Gillilan, supra, at 674, the Court wrote:
 "Thus, Royal Neighbors of America is authority for the proposition that a beneficiary named in a pending insurance application does not have a right to maintain an action against an insurance company for negligently processing an insurance application."
If the beneficiary has no right against an insurance company for negligently processing an insurance application, the beneficiary would have no such right against a third party employed by the insurance company to obtain information necessary for evaluation before the issuance of a policy, for negligence in the collection, assembly, transmission, or handling of such information.
 Beneficiary's Individual Action for Intentional Misconduct
Where fraudulent representations are made to a beneficiary of a life insurance policy at the time the application for the policy is made by the insured, the beneficiary may have standing to bring an action for fraud. North CarolinaMutual Life Insurance Co. v. Holley, 533 So.2d 497 (Ala. 1987); see National States Insurance Co. v. Jones,393 So.2d 1361 (Ala. 1980), and Old Southern LifeInsurance *Page 465 Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976). In each of these cases, the representations were made to and directed at the individual plaintiffs; and in NationalStates and Old Southern the consideration for the contracts "was to and did flow from the plaintiffs."National States, at 1364. There is nothing in the record to show that any fraudulent representations were made to Ms. Smith or that the consideration for the insurance policy "was to and did flow from" Ms. Smith. Ms. Smith, individually, had no standing.
Likewise, there is not a scintilla of evidence that Equifax and Ms. Puckett engaged in "negligent . . . or intentional misconduct which proximately caused delay in the collection, assembly and transmission or handling" (emphasis added) of Mr. Smith's medical records or information. The trial court did not err in granting summary judgment in favor of Equifax and Ms. Puckett on Ms. Smith's claims of negligence and intentional misconduct.
It is suggested that these were not the reasons expressed by the trial court in granting the motion for summary judgment, and that we should not consider these reasons in reviewing the trial court's action.
An appellee can defend the trial court's ruling with an argument not raised below, for this Court "will affirm the judgment appealed from if supported on any valid legal ground."Tucker v. Nichols, 431 So.2d 1263, 1265 (Ala. 1983). There is a rather obvious fundamental difference in upholding the trial court's judgment and reversing it; this Court will not reverse the trial court's judgment on a ground raised for the first time on appeal, Costarides v. Miller,374 So.2d 1335 (Ala. 1979), even though it affirms
judgments on bases not asserted in the trial court, Bank ofthe Southeast v. Koslin, 380 So.2d 826 (Ala. 1980). This difference is predicated on the "long-standing, well-established rule that [in order to secure a reversal] the appellant has an affirmative duty of showing error upon the record." Tucker v. Nichols, supra, at 1264.
We do not mean to imply that the reasons given by the trial court for granting the summary judgment on the negligence and intentional misconduct claims were wrong or insufficient, but merely that we do not need to address those reasons, because we can uphold the trial court's judgment on principles of survival, lack of standing, and inadequate allegation of intentional misconduct, without reaching the reasons specifically assigned by the trial court for granting summary judgment to these defendants.
 Deceased Insured's and Beneficiary's Action as Third-Party Beneficiaries for Breach of Contract
We next address the issue of breach of contract. Ms. Smith's amended complaint asserts that Mr. and Ms. Smith were direct or intended beneficiaries under the contract between Mutual Benefit and Equifax, and that Equifax's breach of this contract proximately injured Ms. Smith in her personal and representative capacity.
Mr. Smith had presented an application for a policy of insurance on his life to Mutual Benefit on April 17, 1986. On that day he was examined by a physician authorized by Mutual Benefit to perform the physical examination. Mr. Smith paid Mutual Benefit $2,000 as a prepayment of insurance premiums; that money was deposited and retained by Mutual Benefit until after Mr. Smith's death. Mutual Benefit provided the following "conditional insurance" to Mr. Smith on April 17, 1986:
 "We [Mutual Benefit] will issue, as of the effective date, a policy as applied for if: (a) we receive both Part 1 and Part 2 of the application; and (b) we could have issued such a policy on the effective date under our underwriting standards. * * * * If the proposed insured dies before the termination date, we will deduct from the proceeds the amount if any, needed to make up the initial premium. "If we could not have issued a policy as applied for, we will issue, as of the effective date, a policy based on the application amended to provide for a rating class or the elimination or reduction of *Page 466 
any portion or feature of the risk, or both, if: (a) we receive both Part 1 and Part 2 of the application; and (b) we could have issued such a policy on the effective date under our underwriting standards. The required amendments must be signed and any extra initial premium paid immediately upon notice; otherwise, there will be no insurance, and we will refund the amount paid. If the proposed insured dies before receipt of such notice, the amendments will be considered signed, and we will deduct any unpaid extra initial premium from the proceeds."
Mutual Benefit was contractually obligated to issue the policy, either standard or rated, if such a policy could be issued under its underwriting standards.
Moreover, under the terms of Mutual Benefit's conditional insurance, the insurability of Mr. Smith was to be determined based only on those facts that were known s of the date of the application, April 17, 1986.
The application was received by Mutual Benefit's home office on April 21, 1986.)n April 22, 1986, Mr. Smith was diagnosed by Dr. Gordon Spafford as having a "mediastinal mass."
On May 12, 1986, Mutual Benefit was advised that Mr. Smith had been diagnosed as having "giant cell carcinoma."
On May 27, 1986, Mutual Benefit contracted with Equifax for the collection of certain medical information concerning Mr. Smith.
Mutual Benefit's physician specified many points of desired medical information in a four-page, single-spaced internal memorandum that asked for specific information concerning Mr. Smith's medical history. Equifax was hired by Mutual Benefit merely to collect and transmit this medical information to Mutual Benefit. The information was not to go to or to be considered or utilized by Mr. or Ms. Smith. Mutual Benefit paid Equifax. No written contract existed between Mutual Benefit and Equifax. Mutual Benefit had previously used Equifax to collect and forward medical records. Equifax made a partial report on June 12, and a final report on June 18. The June 18 report included the report from Dr. Spafford (dated June 17) that contained much of the requested information. The undisputed evidence is that Equifax contacted Dr. Spafford every day from the day Dr. Spafford had a medical release from Mr. Smith until the report was obtained, in an attempt to obtain this information. Mr. Smith died on June 17.
 "Alabama law is clear to the effect that one for whose benefit a valid contract has been made, although that person is not a party thereto and does not furnish any consideration therefor, may maintain an action on the contract against the promisor."
Harris v. Board of Water Sewer Commissioners of theCity of Mobile, 294 Ala. 606, 611, 320 So.2d 624, 628
(1975).
To have a right to maintain an action for breach of contract, the third party must directly, as opposed to indirectly or incidentally, benefit from the performance of the contract.Mills v. Welk, 470 So.2d 1226 (Ala. 1985).
Ms. Smith argues that the following facts show that she and Mr. Smith were to have been directly and notindirectly, or only incidentally, benefited by the oral contract between Mutual Benefit and Equifax, and, therefore, that they could maintain an action on that contract:
(1) Equifax understood that the services were intended to benefit not only Mutual Benefit but also the person seeking the insurance, Mr. Smith. The only factual support for this is the following excerpt from the deposition testimony of Ms. Puckett when questioned by Ms. Smith's attorneys:
 "Q. Now, my next question is not a question necessarily about what you did do. It's a question about what you have done — should have done if you followed your own procedures, okay?
"A. Uh-huh.
 "Q. If on June 6th you had been told that Dr. Spafford's office was prepared to release Mr. Smith's records, would you *Page 467 
then on that same day have begun your efforts to secure those records?
 "A. Yes, and if the dates don't comply to that there.
 "Q. Again, the question is posed as a hypothetical.
"A. Yes.
"Q. So hypothetically . . .
"A. I would have started immediately.
 "Q. And the reason for that would have been because not only did Mutual Benefit have an interest in seeing those records collected but Mr. Smith had an interest in seeing those records collected?
"A. That's right."
(2) Equifax knew that Mr. Smith "was real sick and wanted to get a policy through."
(3) Mr. Smith's file "was handled with more urgency than [the] normal file."
Ms. Puckett testified in her deposition as follows:
 "A. Any report I make is important and any report I make I try to do it as fast as I can.
 "Q. I believe you said earlier that this report was handled with a little bit more urgency or maybe a good bit more urgency than your normal report; is that correct?
"A. That's right.
 "Q. And that this file was handled with more urgency than your normal file?
"A. That's right.
 "Q. Did anyone tell you why this additional urgency was required?
"A. I knew he was real sick. I had heard that.
 "Q. Did anyone tell you anything about why this urgency was required?
 "A. Other than the fact that he was real sick and wanted to get a policy through, that would be it. I don't recall anybody actually saying that specifically but that would be the case."
(4) Mutual Benefit expected Equifax to promptly collect Mr. Smith's medical records and not delay in transmitting these records to Mutual Benefit.
An employee of Mutual Benefit testified as follows in her deposition:
 "Q. Does Mutual Benefit expect Equifax to collect records promptly?
"A. Yes.
"Q. And, not to delay in obtaining those records?
"A. Yes."
We are not persuaded that this is sufficient to create a scintilla of evidence that the contract between Mutual Benefit and Equifax was for the direct benefit of Mr. and Ms. Smith. InMills v. Welk, supra, this Court upheld the dismissal of a third-party claim. In Mills, the contract in question was between a poultry company and its servicemen. The contract required the servicemen to assist and work with the chicken growers from whom the poultry company bought chickens. We noted that the servicemen were "hired . . . to assist the growers and work with them in an attempt to realize the maximum profit for the minimum outlay," that the servicemen would "maintain daily contact with the growers" and "make suggestions concerning any changes or improvements," and that the servicemen's "job was to aid the contract growers in their attempts to raise quality chickens." 470 So.2d at 1227. We held that these things constituted merely incidental benefits and not a direct benefit to the chicken growers and that they had no standing to bring an action for breach of contract as third-party beneficiaries of the contract between the poultry company and its servicemen.
In Zeigler v. Blount Brothers Construction Co.,364 So.2d 1163 (Ala. 1978), we held that electricity customers of Alabama Power Company, whose electric rates rose when a hydroelectric dam collapsed, were not third-party beneficiaries of contracts between Alabama Power Company and the contractors that built and inspected the dam. We noted that the construction and inspection contracts were not made for the "direct" benefit of the plaintiffs but only for their incidental benefit.
There are cases from other jurisdictions that are closer factually to the case at issue. In Velastequi v. ExchangeInsurance *Page 468 Co., 132 Misc.2d 896, 505 N.Y.S.2d 779 (N.Y. City Civ.Ct. 1986), the plaintiff was an insured whose insurance was cancelled because of a motor vehicle accident. One of the defendants was a claims investigator that had been hired by the plaintiff's insurer to investigate and report on the plaintiff's accident. The plaintiff contended that he was a third-party beneficiary of the contract between his insurance company and the claims investigator. The court granted the claims investigator's motion to dismiss and stated that the case presented the novel issue of "what duty, if any, is owed by an independent investigator or adjustor, retained by an insurance company, to the holder of the insurance policy issued by said company." 505 N.Y.S.2d at 780. The court noted that the plaintiff may have been an incidental beneficiary to the contract, but that this was not sufficient:
 "Although the plaintiff may have been an incidental beneficiary to the aforementioned contract, he did not acquire a legally enforceable right.
 " 'An incidental beneficiary acquires by virtue of the promise no right against the promisor or promisee.' Restatement of Contracts § 147"
505 N.Y.S.2d at 781.[1]
In Gay v. Broder, 109 Cal.App.3d 66, 167 Cal.Rptr. 123
(1980), the plaintiff was an applicant for a Veterans Administration guaranteed loan. The defendant was a real estate appraiser who submitted an appraisal to the VA for its consideration in deciding whether to guarantee the loan. The plaintiff, who paid for the appraisal, claimed that he was a third-party beneficiary of the contract between the appraiser and the VA. The court dismissed the third-party beneficiary claim on the pleadings.
We have reviewed all of the cases cited by Ms. Smith in her brief and have found three that uphold the right to assert third-party beneficiary claims. In Harris v. Board of Water Sewer Commissioners, 294 Ala. 606, 320 So.2d 624 (1975), we noted that the real beneficiaries of the contract between the City of Mobile and the Water Board were the people of the City who relied upon the services to be provided by the City for their protection. "[T]he most direct benefit inures to the people of the City, like Harris, who rely on these city-provided services for the protection of their property."294 Ala. at 611, 320 So.2d at 628. In Holley v. St. PaulFire Marine Insurance Co., 396 So.2d 75 (Ala. 1981), we again dealt with a public body (a public hospital board). We held that the board had made a contract with a company to perform safety inspections not for the Board's direct benefit, but for the direct benefit of the occupants of the hospital. We asked "[f]or whom does the Board maintain the hospital," and we answered "[o]bviously for those who will inhabit it for purposes of treatment, rehabilitation and cure." 396 So.2d at 80. In Mutual Benefit Health Accident Association v.Bullard, 270 Ala. 558, 120 So.2d 714 (1960), we addressed the question of whether employees, who paid premiums through salary deductions, had third-party beneficiary rights under the employer's group accident insurance policy. We held that the policy showed that it was a contract intended for the direct benefit of the employee-plaintiff, and, therefore, that he had a right to sue thereon; and that the trial court did not err in refusing the affirmative charge; the insurer had sought the affirmative charge on the ground that the facts proved did not show that the plaintiff had a right to recover.
These cases are distinguishable from the case at issue. The information that Equifax was to gather was to benefit Mutual Benefit. With that information, Mutual Benefit could determine whether it could have, on April 17, 1986, under its underwriting standards, issued a life insurance policy on the life of Mr. Smith. Mr. or Ms. Smith may or may not have even incidentally benefited from Equifax's performance of the contract. If the information revealed that Mr. Smith was uninsurable on April 17, 1986, in accordance with Mutual Benefit's underwriting standards, certainly Mr. *Page 469 
Smith would receive no benefit from the contract between Equifax and Mutual Benefit, which was entered into after it was established that Mr. Smith was uninsurable by any other insurer.
In another field of law — defamation — courts have substantially curtailed an individual's right to sue an information reporting company because, as a matter of policy, they have deemed it desirable to promote the furnishing of information. The doctrine of qualified or conditional privilege has been extended to the furnishing of information in a business context by an information reporting company.Hooper-Holmes Bureau v. Bunn, 161 F.2d 102, 104 (5th Cir. 1947); Retail Credit Co. v. Garraway, 240 Miss. 230, 126 So.2d 271, 275 (1961). Under the test enunciated inBerry v. City of New York Ins. Co., 210 Ala. 369,98 So. 290 (1923), which is quoted with approval in Willis v.Demopolis Nursing Home, Inc., 336 So.2d 1117, 1120 (Ala. 1976), and Browning v. Birmingham News, 348 So.2d 455,458 (Ala. 1977), an information reporting company, in reporting to a client in a business context, would have a "qualified" privilege, for this is a communication prompted by a duty owed to a client (the party requesting the information in a business context) and the information would be privileged if communicated in good faith and without actual malice.
As a matter of public policy, it is desirable to promote the furnishing of information in a business context. In a case like this, where one person contracts for information in a business context from a second person (the information reporting company), if we should hold that the person about whom the information is requested has standing as a third-party beneficiary to sue for breach of that contract, then we would be undermining the policy of promoting the furnishing of information in a business context. Public policy dictates against extending third-party beneficiary status to persons such as Mr. and Ms. Smith.
For another reason, Ms. Puckett cannot be held liable for breach of contract. The contract was clearly between Equifax, Ms. Puckett's principal, and Mutual Benefit. An agent cannot be held liable for her principal's breach of contract. Harrellv. Reynolds Metals Co., 495 So.2d 1381, 1389 (Ala. 1986).
The trial court did not err in granting summary judgment in favor of Equifax and Ms. Puckett.
AFFIRMED.
TORBERT, C.J., and MADDOX, ALMON and BEATTY, JJ., concur.
[1] The court in Velastequi held that a negligence claim could not be maintained because no duty was owed by the insurance investigator to the insured.